IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
September 19, 2017 Session

## STATE OF TENNESSEE v. RAYMOND BANJARD MIMS[1]

**Appeal from the Criminal Court for Sullivan County**
**No. S63705   R. Jerry Beck, Judge**

_____

### No. E2016-02425-CCA-R3-CD

_____

After being charged by presentment with three counts of the Class A felony, criminal conspiracy to commit first degree murder, as well as one count of criminal conspiracy to possess more than ten pounds of marijuana with the intent to sell or deliver and one count of simple possession of marijuana, Defendant, Raymond Banjard Mims, entered a quite favorable plea agreement.  Defendant pled guilty to greatly reduced counts of conspiracy to commit assault, Class B misdemeanors, in addition to conspiracy to possess over ten pounds of marijuana for sale or delivery and simple possession of marijuana in exchange for an effective sentence of two years.  He reserved the right to seek an alternative sentence.  The trial court denied alternative sentencing.  Defendant appeals the denial of an alternative sentence.  After a review, we determine that the trial court did not abuse its discretion in ordering Defendant to serve his sentence in confinement.  Accordingly, the judgments of the trial court are affirmed.

 **Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ROBERT W. WEDEMEYER, JJ., joined.

James T. Bowman (at plea and on appeal), Johnson City, Tennessee, and C. Brad Sproles (on appeal), Kingsport, Tennessee, for the appellant, Raymond Banjard Mims.

Herbert H. Slatery III, Attorney General and Reporter; Katherine C. Redding, Assistant Attorney General; Barry P. Staubus, District Attorney General; and Joseph Eugene Perrin, Assistant District Attorney General, for the appellee, State of Tennessee.

_____

[1] The presentment and all documents in the technical record, with the exception of the notice of appeal, spell Defendant's last name as "Mims."  The notice of appeal and Defendant's brief on appeal refer to Defendant by the last name "Mimms."  For consistency, we will refer to Defendant as "Mims," the way his name appears in the indictment.

# OPINION

In April of 2015, Defendant and Bradley Joe Hirst were indicted by the Sullivan County Grand Jury for three counts of conspiracy to commit first degree murder, conspiracy to possess over ten pounds of marijuana with the intent to sell or deliver, and possession of marijuana.

Prior to trial, Defendant pled guilty to two counts of conspiracy to commit assault, a class B misdemeanor, in exchange for a sentence of six months with 75% release eligibility. Defendant also pled guilty to conspiracy to possess more than ten pounds of marijuana for sale or delivery and simple possession of marijuana, in exchange for sentences of two years and six months, respectively.[2] The plea agreement specified that Defendant could apply for probation.

At the plea hearing, the State announced the evidence would establish that Tony Thomas, a small-time drug dealer, met Defendant through his supplier, "Rack." Mr. Thomas told Defendant that he could get large quantities of marijuana from an associate named T.J. Hamler in Houston, Texas. Defendant was willing to provide the money to secure the purchase of the marijuana but did not want to come in contact with the drugs. Arrangements were made for Codefendant Hirst and Mr. Thomas to go to Houston to purchase the marijuana. The ill-fated plan was for Mr. Thomas to take $20,000 and purchase 50 pounds of marijuana directly from an associate in Texas. Before they left, Codefendant Hirst provided Mr. Thomas's wife, Kimberly, with his cell phone number so that the couple could communicate while Mr. Thomas was gone.

Mr. Thomas and Codefendant Hirst arrived in Houston and checked in to a Residence Inn where Codefendant Hirst introduced Mr. Thomas to an individual with the street name of "Cowboy." Codefendant Hirst left with "Cowboy" and later returned by himself, telling Mr. Thomas that "Cowboy" was in the parking lot with the marijuana. Mr. Thomas went to the parking lot and got into a vehicle with "Cowboy." According to Mr. Thomas, "Cowboy" took the $20,000 by gunpoint.

At that point, Mr. Thomas was not sure if he had been set up by Codefendant Hirst or if he had actually been robbed, so he went to a Greyhound bus station and called his wife. His wife picked him up at the bus station in Atlanta. On the way to Atlanta, Mrs. Thomas was called several times by Codefendant Hirst. At first, Codefendant Hirst inquired about Mr. Thomas's whereabouts, but eventually Codefendant Hirst began to

---

[2] Codefendant Hirst pled guilty to two counts of conspiracy to commit assault and conspiracy to possess more than ten pounds of marijuana for sale or delivery.

threaten Mr. Thomas, insinuating that he had ripped them off and stolen the money. At one point, Codefendant Hirst told Mrs. Thomas he would "get in [her] house and [he would] kill [her] and [her] family if we don't get this money back." Mr. and Mrs. Thomas made it back to Kingsport but fled to Virginia Beach shortly thereafter for safety concern.

When Codefendant Hirst returned to Kingsport, he recruited several men to attempt to get the money back from Mr. Thomas. Four men, including Codefendant Hirst, went to Mr. Thomas's apartment. Codefendant Hirst was armed with a handgun and made statements to Mr. Thomas about the lengths he would go to in order to recover the money, including threatening the use of force and violence. The three men who had agreed to help Codefendant Hirst changed their minds at this point, withdrawing from their agreement to assist him in getting the money back from Mr. Thomas. One of the men, Megan Loggans, came forward to the police because he actually feared for his family. His statement led to an investigation of the matter, including a BOLO ("be on the lookout") for Codefendant Hirst's vehicle.

Codefendant Hirst was located by Officer Todd Ide. The vehicle was stopped for a traffic violation; Codefendant Hirst consented to a search. The search of the vehicle resulted in the discovery of a parking ticket from the Residence Inn in Houston, binoculars, a taser disguised as a flashlight, and a pair of gloves. Codefendant Hirst told the officers that he was in town to see Defendant. Codefendant Hirst was allowed to leave. However, one of the officers inadvertently kept Codefendant Hirst's driver's license.

The following day, Mr. Thomas made a recorded call to Defendant. In total, three telephone calls were made and recorded. During the first call, Mr. Thomas acknowledged that he needed to pay Defendant back. He asked for a couple of days to work things out and told Defendant he was scared to walk out of his house. Defendant told Mr. Thomas he was "not going to shoot [him] walking across [his] parking lot, but [told] him up front if [he] tr[ied] to leave," there would be someone watching him. Defendant told Mr. Thomas he would not take "the tail" off of him but that he would tell the "tail not to do anything to [Mr. Thomas] for two days." During the first conversation, Defendant agreed to let Mr. Thomas have four days to get ten pounds of marijuana as a partial repayment.

Officers began preparations to secure ten pounds of marijuana as part of a controlled delivery of the marijuana from Mr. Thomas to Defendant and Codefendant Hirst. Before the exchange could take place, Codefendant Hirst came to the police department to retrieve his driver's license. He was placed under arrest.

After Codefendant Hirst was arrested, Mr. Thomas called Defendant back to tell him that the ten pounds of marijuana were in a car outside of Walmart. Immediately after the phone call, Codefendant Hirst's phone rang. Defendant's name and telephone number appeared on the caller identification. Defendant's number called Codefendant Hirst seven times over the next two hours.

Defendant was already under surveillance by this time and was observed on his cell phone multiple times. Defendant was in the general area of the vehicle containing the marijuana. Mr. Thomas made another call to Defendant to ask if he was happy with the marijuana. Defendant told Mr. Thomas he did not go to the car because it was "under a bunch of surveillance." At that point, officers placed Defendant under arrest. When he was arrested, marijuana was found in his pocket.

The trial court accepted the guilty plea and the proposed sentence. The matter was set for a sentencing hearing during which the trial court would determine whether Defendant would receive an alternative sentence. Defendant testified at the sentencing hearing. At the time, he was fifty-four years of age and operated three "check cashing" businesses that provide cash advances and title loans in the Kingsport area. Defendant employed five people and had operated his businesses continually since 2005. Defendant also operated gold purchasing businesses at these locations and at a store in Greer, South Carolina. In addition, Defendant started a trucking company before his arrest. Defendant explained that the three check cashing businesses produced a gross income of $595,000, and the gold purchasing business produced a gross income of $145,000. Defendant did not testify about the gross income of the trucking company. Defendant handled all of the "corporate" aspects of the business, from payroll to taxes, and informed the trial court that if he were incarcerated, the businesses would "dissolve."

Defendant admitted that he started a company called Aqua Vapor and told the trial court that he planned to use the 50 pounds of marijuana to "test it and use it for vaporing" when "marijuana became legal" in Tennessee. Defendant did not consider himself to be a "marijuana smoker or [alcohol] drinker" but admitted that he had marijuana in his pocket when he was arrested. Defendant claimed that "someone had just handed [the joint] to him."

The presentence report indicated that Defendant had prior convictions for theft of property valued at $500 or less, misdemeanor assault, and harassment along with a host of other charges that were dismissed. Defendant dropped out of high school in tenth grade but later received his GED and, eventually, a college degree in business from Southern Wesleyan University.

The trial court acknowledged Defendant's "older" criminal record but determined that it "would not overcome the state law in regards to granting . . . probation." The trial

court also acknowledged that Defendant was the owner and operator of several businesses "employing various people, and people can be affected by [the court's decision on sentencing] other [than Defendant]." The trial court was concerned because "[Mr. Thomas's] child got involved in this" and "probably learned of the alleged threat through her parents." The trial court noted that Mr. Thomas, in a recorded conversation, told Defendant he "heard you have got people trying to hurt me and hurt my family. . . ." The victim asked Defendant to "work this out" and to keep his family safe. The victim told Defendant he would do "[w]hatever [he had] to do, and do it. And that's a promise on my kid's life." In response, Defendant told him "that's almost what's at stake here." The trial court perceived Defendant's statements as a "threat against the child," akin to "something out of a – a Robert De Niro-Marlon Brando movie." As a result of the proof at the sentencing hearing, the trial court denied an alternative sentence.

Defendant appeals the denial of alternative sentencing.

*Analysis*

On appeal, Defendant argues that the trial court erred in denying alternative sentencing. Specifically, Defendant contends that a two-year sentence of incarceration is excessive and inconsistent with the purposes of sentencing.[3]

When the record establishes that the trial court imposed a sentence within the appropriate range that reflects a "proper application of the purposes and principles of our Sentencing Act," this Court reviews the trial court's sentencing decision under an abuse of discretion standard with a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). The same standard of review applies to a trial court's decision regarding "probation or any other alternative sentence." *State v. Caudle*, 388 S.W.3d 273, 278-79 (Tenn. 2012); *see also State v. King*, 432 S.W.3d 316, 325 (Tenn. 2014) (applying the same standard to judicial diversion). This Court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Bise*, 380 S.W.3d at 709-10. Moreover, under those circumstances, we may not disturb the sentence even if we had preferred a different result. *See State v. Carter*, 254 S.W.3d 335, 346 (Tenn. 2008). The party appealing the sentence has the burden of demonstrating its impropriety. T.C.A. § 40-35-401, Sent'g Comm'n Cmts.; *see also State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991).

---

[3] Defendant will be automatically and statutorily eligible for probation after reaching his release eligibility date (30% of two years), less sentencing credits earned and retained by Defendant. *See* T.C.A. § 40-35-501(a)(3) and (c).

Tennessee Code Annotated section 40-35-102(3)(C) provides that "[p]unishment shall be imposed to prevent crime and promote respect for the law by . . . [e]ncouraging effective rehabilitation of those defendants, where reasonably feasible, by promoting the use of alternative sentencing and correctional programs that elicit voluntary cooperation of defendants[.]" Tennessee Code Annotated section 40-35-104(c)(9) authorizes a "sentence to a community based alternative to incarceration . . . ." Additionally, "[t]he potential or lack of potential for the rehabilitation or treatment of the defendant should be considered in determining the sentence alternative or length of a term to be imposed," and "[t]he length of a term of probation may reflect the length of a treatment or rehabilitation program in which participation is a condition of the sentence[.]" T.C.A. § 40-35-103(5). On the other hand, sentences involving confinement should be based on the following considerations:

> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;

> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or

> (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant[.]

T.C.A.§ 40-35-103(1). Moreover, the sentence imposed "should be no greater than that deserved for the offense committed" and also "should be the least severe measure necessary to achieve the purposes for which the sentence is imposed." T.C.A. § 40-35-103(2), (4).

A defendant is eligible for probation if the sentence imposed is ten years or less. T.C.A. § 40-35-303(a). Although "probation shall be automatically considered by the court as a sentencing alternative for eligible defendants," the defendant bears the burden of "establishing suitability" for probation. T.C.A. § 40-35-303(b). "This burden includes demonstrating that probation will 'subserve the ends of justice and the best interest of both the public and the defendant.'" *Carter*, 254 S.W.3d at 347 (quoting *State v. Housewright*, 982 S.W.2d 354, 357 (Tenn. Crim. App. 1997)). A defendant who is sentenced as an especially mitigated or standard offender and who has committed a Class C, D, or E felony should be "considered as a favorable candidate for alternative sentencing options" if certain conditions are met. T.C.A. § 40-35-102(5), (6)(A). The guidelines regarding favorable candidates are advisory. T.C.A. § 40-35-102(6)(D). In this case, Defendant was convicted of two class B misdemeanors, a Class A misdemeanor, and a Class E felony, received a two-year sentence, and was not convicted

of any of the offenses listed in the statute rendering him ineligible for an alternative sentence. Defendant was considered a favorable candidate for alternative sentencing.

Defendant argues that the trial court improperly denied probation by failing to consider all the factors contained in Tennessee Code Annotated section 40-35-103, instead basing the denial of an alternative sentence on the victim impact statements. In our view, the trial court determined that incarceration was necessary to avoid depreciating the seriousness of the offense. The record supports this decision. *See State v. Trotter,* 201 S.W.3d 651, 656 (Tenn. 2006) (holding that denial of an alternative sentence may be based on sentencing consideration (B) alone). The trial court also commented on the denial of an alternative sentence on the basis of Defendant's criminal history. Although the trial court noted that Defendant's criminal history was not extensive, the trial court noted Defendant's prior convictions for theft, assault, harassment, obstruction of service of process, and domestic assault. The trial court did not abuse its discretion in utilizing and considering Defendant's criminal history in denying an alternative sentence. While Defendant successfully completed probation on at least two prior occasions, that experience clearly did not thwart his involvement in future criminal behavior. Defendant has failed to establish an abuse of discretion or otherwise overcome the presumption of reasonableness afforded to the trial court's denial of alternative sentencing. In fact, he presented no argument or evidence about his potential for rehabilitation. Defendant is not entitled to relief.

*Conclusion*

For the foregoing reasons, the judgment of the trial court is affirmed.

_____
TIMOTHY L. EASTER, JUDGE